**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STAR AMERICA RAIL HOLDCO, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0883-LWW |
| CASEY CATHCART, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CATHCART RAIL HOLDCO, LLC, | ) ) | |
| Nominal Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: October 18, 2024
Date Decided: December 17, 2024

Raymond J. DiCamillo, Kevin M. Gallagher, Andrew L. Milam, Kaitlyn R. Cannan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Laura K. O'Boyle, Nathan C. Strauss, Zachary R. Edelman, GIBSON, DUNN & CRUTCHER LLP, New York, New York; Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; *Counsel for Plaintiff Star America Rail HoldCo, LLC*

Jennifer R. Hoover, Andrew D. Kinsey, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, Wilmington, Delaware; Andrew G. Fiorella, Alyssa A. Moscarino, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP, Cleveland, Ohio; *Counsel for Defendant Casey Cathcart*

Tyler J. Leavengood, Charles Wood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Nominal Defendant Cathcart Rail HoldCo, LLC*

**WILL, Vice Chancellor**

Cathcart Rail Holdco, LLC was co-founded by Casey Cathcart, who served as its CEO. In 2020, the company took on an outside investor. The investor negotiated for a contractual right to remove Cathcart as CEO and replace him if the company's annual EBITDA was below $18 million. When EBITDA fell short of the threshold in 2023, the investor sought out a new CEO.

Cathcart resisted. He prodded the company's CFO to alter financial results so that reported EBITDA exceeded $18 million. Even after the investor sued for a declaration that Cathcart was validly removed and replaced, Cathcart insisted that 2023 actual EBITDA was disputed. He knew that this position was baseless.

Nevertheless, expedited discovery—including into the calculation of EBITDA—ensued. On the eve of trial, Cathcart conceded that 2023 actual EBITDA was less than $18 million. He focused instead on arguing that the investor could not remove and replace him without other members' consent.

The unambiguous terms of the contract prove otherwise. The investor was entitled to remove and replace Cathcart as CEO. It did not act unreasonably or in bad faith in exercising its discretion to do so. Judgment is entered for the investor and fees are shifted.

# I. BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

## A. Cathcart Rail's Formation

Cathcart Rail HoldCo, LLC (the "Company") is a privately held Delaware limited liability company.[2] It owns 100% of the membership interests of Cathcart Rail, LLC—an Illinois entity that operates in the railroad industry.[3]

In 2015, Casey Cathcart and his father Thom formed Cathcart, Inc. (formerly T&C Rail Holdings, Inc.).[4] Each individual owned 50% of the corporation.

They subsequently formed the Company, with Cathcart, Inc. as its sole member, to acquire a railcar repair facility.[5] Through Cathcart, Inc., Casey and Thom Cathcart had equal ownership of the Company at the time of its formation.[6]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 83) ("PTO"). The trial record includes live testimony of 3 fact witnesses and 177 joint exhibits (including 4 deposition transcripts). Trial testimony is cited as "[Name] Tr. __." *See* Dkt. 97. Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* Dkt. 82 Ex. A. Deposition transcripts are cited as "[Name] Dep. __."

[2] PTO ¶ 5.

[3] *Id.*; *see* Cathcart Tr. 8. This decision refers to Casey Cathcart as "Cathcart."

[4] Cathcart Tr. 12.

[5] *Id.* at 12-13.

[6] *Id.* at 130-31.

The Company grew into a successful freight rail platform.[7] It functions mainly in the short line space, meaning rail lines that connect to a larger railroad network. It has three general divisions: certified railcar service and repair facilities; rail agent inspection services; and short line railroads that facilitate moving railcars across lines.[8]

## B. Star Infra's Investment

By 2020, the Company was demonstrating continued signs of success.[9] It sought out new paths to advance its growth.[10]

In May 2020, Cathcart was approached by Tikehau Star Infra—an infrastructure asset investor—about a potential investment in the Company.[11] Though Cathcart had some trepidation, he accepted the offer.[12] Tikehau Star Infra established Star America Rail HoldCo, LLC ("Star Infra") to hold its investment in the Company.[13] Star Infra became a member of the Company alongside

---

[7] *Id.* at 13, 16.

[8] *Id.* at 8-9.

[9] *Id.* at 15-16.

[10] *Id.*

[11] *Id.* at 16; Melson Tr. 135.

[12] Cathcart Tr. 16-17.

[13] Melson Tr. 137.

Cathcart, Inc.[14]   It continued to make additional investments in the Company, totaling $70 million.[15]

The terms of Star Infra's investment were outlined in a September 2, 2020 Subscription Agreement among the Company, Star Infra, and Cathcart, Inc.[16] Section 1.4 of the Subscription Agreement contemplated that Star Infra could increase its equity ownership percentage if the Company's "Actual EBITDA" fell below its "Target EBITDA."[17]  "Actual EBITDA" means "earnings before interest, taxes, depreciation and amortization" as calculated in accordance with GAAP during an "Applicable Calculation Period."[18]  "Target EBITDA means $4,480,000."[19]

On December 14, 2020, the parties executed a second amended limited liability company agreement and an amended Subscription Agreement.[20] Section 1.4 of the Subscription Agreement continued to provide that "in the event Actual

---

[14] PTO ¶ 3.  After the investment, Cathcart, Inc. owned 75% of the Company's issued and outstanding common units; Star Infra owned 25%.  JX 1 at 4.  The terms of the Subscription Agreement were later amended such that each party owned 50% of the Company's issued and outstanding common units.  JX 7 Ex. B.

[15] Melson Tr. 137-39.

[16] PTO ¶ 6.

[17] *Id.* ¶ 8; JX 1 at 3.

[18] JX 1 Ex. A.

[19] *Id.*

[20] PTO ¶¶ 7-8, 11; JX 3; JX 4.

EBITDA for the Applicable Calculation Period is less than Target EBITDA," Star Infra's percentage of equity ownership in the Company would be increased.[21]

## C.    CEO Replacement Negotiations

In late 2021, the Company's performance faltered.[22]   Star Infra notified Cathcart that Section 1.4 of the Subscription Agreement had been triggered, entitling it to a greater percentage of Company equity.[23]  Cathcart asked Star Infra to discuss a "settlement" to remove this provision of the Subscription Agreement.[24]   He proposed that, in exchange, the parties would "explore the option of designating a permanent CEO so that [he] [could] continue [his] role as Executive Chairman."[25]

Star Infra's representative, Mark Melson, confirmed that they would "work together to identify a new CEO with the goal of putting that person in place by June 30, 2023."[26]  He expressed Star Infra's hope that Cathcart would remain Executive Chairman.[27]

---

[21] PTO ¶ 8; JX 3 § 1.4; *see also* JX 3 § 1.3 (amending the definition of "Actual EBITDA").

[22] Cathcart Tr. 21-22.

[23] PTO ¶ 9; Cathcart Tr. 66-67.

[24] PTO ¶ 10; Cathcart Tr. 70-71; JX 12 at 5.

[25] Cathcart Tr. 70-71; JX 12 at 5-6.

[26] JX 12 at 3.

[27] *Id.* at 2.

5

The parties then exchanged proposals for amending the Company's limited liability company agreement and the Subscription Agreement.[28] The proposals all contemplated that Cathcart would step down as CEO by a set date.[29] One sticking point was whether Star Infra would have the sole discretion to select a new CEO or whether the Company's board would have a say.[30]

Negotiations paused for a time and resumed in spring 2022.[31] In April, discussions about a replacement CEO provision shifted from a time-based trigger to a performance-based one.[32] Cathcart proposed that if the Company's EBITDA fell below $23.5 million in 2023, he "[would] agree to open a search for a new CEO and look to appoint one as quickly as one [was] identified," subject to board approval.[33] Star Infra demanded a second, lower EBITDA threshold at which it would have a unilateral CEO replacement right not subject to board or other member approval.[34]

On May 12, Star Infra sent Cathcart a draft amendment to the operative limited liability company agreement that included a two-tier CEO replacement provision in

---

[28] *See* JX 13; JX 14.

[29] *See* Melson Tr. 149.

[30] *See* Cathcart Dep. 87; JX 20; JX 24; JX 19 at 5; Melson Tr. 150.

[31] *See* Melson Tr. 147-48; JX 17 at 1.

[32] *See* Cathcart Tr. 72; Melson Tr. 152-54.

[33] JX 27 at 3; *see* Cathcart Tr. 73.

[34] Melson Tr. 155-57; Cathcart Tr. 74-75.

Section 8.3(a).[35] The first tier adopted Cathcart's proposal. It provided that if 2023 EBITDA was below $23.5 million, the Company's board would launch a search for a replacement CEO, subject to the approval of Star Infra and Cathcart Inc.[36] The second threshold contemplated that if 2023 EBITDA was below $20 million, Star Infra could terminate Cathcart and hire a replacement CEO on terms set in its "sole and absolute discretion."[37]

Cathcart provided feedback on May 17.[38] His only comment to Section 8.3(a) was that the calculation of EBITDA needed to "include adjustments / add-backs, not simply GAAP EBITDA."[39]

In response, Star Infra proposed a definition of EBITDA that was consistent with the Company's credit agreement with various lenders.[40] This definition "include[d] fewer adjustments" than Cathcart suggested.[41] To make Cathcart "more

---

[35] JX 28.

[36] *Id.* at 6 ("On or after December 31, 2023, in the event that the EBITDA for the Company was less than $23,500,000 for the calendar year ending December 31, 2023, but more than $20,000,000 the Board will commence with a search for a replacement Chief Executive Officer, subject to approval of the Star Infra Member and Cathcart Member, acting in the best interests of the Company and not to be unreasonably withheld conditioned or delayed.").

[37] JX 28 at 6.

[38] PTO ¶ 15; JX 30.

[39] JX 30 at 8; *see also* JX 32.

[40] JX 34 at 6; *see* JX 45 (Credit Agreement).

[41] JX 32.

comfortable," Star Infra offered to lower the trigger amounts.[42] Star Infra's proposal set the upper threshold for a board-led CEO replacement at $21 million and the lower threshold for Star Infra's unilateral replacement right at $18 million.[43]

Cathcart agreed to use the lender's EBITDA definition at these lower threshold amounts.[44] On June 12, he suggested that Section 8.3(a) "[u]se 'Actual EBITDA' instead of 'EBITDA'" and that "Actual EBITDA" be "calculated in accordance with the terms of the Company's senior loan agreement."[45]

### D.    The Amended LLC Agreement

On July 8, 2023, the parties further amended the Company's limited liability company agreement (the "LLC Agreement").[46]

The LLC Agreement adopted the negotiated two-tier performance threshold for replacing the Company's CEO. If 2023 Actual EBITDA was less than $21 million but greater than $18 million, the Company's board would launch a CEO search "subject to the consent of Star Infra and Cathcart Inc. (not to be unreasonably withheld . . .)."[47] If 2023 Actual EBITDA was less than $18 million, Star Infra had

---

[42] PTO ¶ 16; JX 33 at 1.

[43] JX 33.

[44] JX 36.

[45] PTO ¶ 20; JX 38 at 1.

[46] PTO ¶ 21; JX 46 ("LLC Agreement").

[47] LLC Agreement § 8.3(a); *id.* at § 2.1 (defining "Actual EBITDA").

8

the unilateral right to "terminate" Cathcart as CEO and "hire a replacement" on "terms and conditions" set in its "sole and absolute discretion."[48]

The LLC Agreement also laid out the timing for the Company's delivery of a "detailed statement and calculation of Actual EBITDA."[49] The statement had to be delivered to Star Infra "within 120 days of the end of calendar year ending December 31, 2023."[50]

### E. The 2023 EBITDA Calculation

On January 17, 2024, Company Chief Financial Officer Kirk Feiler sent Star Infra a calculation showing 2023 Actual EBITDA of $17.6 million.[51] The figure was calculated "as defined in the [Company's] credit agreement."[52] Feiler's cover email represented that the numbers "should be final."[53]

Feiler confirmed this calculation in reports delivered on February 9, February 16, March 15, April 10, and April 29.[54] The Company also sent its lender a draft compliance certificate on April 22 showing "2023 Consolidated EBITDA" of $17.6

---

[48] *Id.* § 8.3(a).

[49] *Id.*

[50] *Id.* 120 days after December 31, 2023 is April 29, 2024.

[51] JX 47 at 6; Melson Tr. 162-63.

[52] Feiler Tr. 243; *see also* Feiler Dep. 28.

[53] JX 47 at 1.

[54] JX 50 at 16; JX 51 at 7; JX 53 at 7; JX 60 at 5; JX 66 at 46; *see also* Feiler Tr. 235-36.

9

million.[55]  The definition of "Consolidated EBITDA" in the credit agreement has the same meaning as Actual EBITDA in the LLC Agreement.[56]

## F.    The CEO Search

In April 2024, Star Infra retained two executive search firms (Korn Ferry and BluWave) to seek out CEO candidates.[57]  It also established a screening committee to review individuals the firms identified.[58]  Star Infra was presented with and considered at least five CEO candidates over several weeks.[59]

In mid-April, Korn Ferry proposed Jeff Chick as a candidate who "checks all the boxes" and was the "closest fit" to Star Infra's criteria "of all the candidates [it had] presented."[60]  Star Infra's ideal candidate was one "who had dealt with distressed situations," which was important to it since the Company had defaulted on its credit agreement.[61]

---

[55] JX 63 at 1.

[56] *See* LLC Agreement § 2.1.

[57] Melson Tr. 168-69.

[58] JX 74 at 23; Melson Tr. 168-70.

[59] Melson Tr. 169; JX 74 at 13.

[60] JX 74 at 9-10.

[61] Melson Tr. 170.

Star Infra's search committee interviewed Chick multiple times.[62]  In June, after additional diligence, Star Infra formally hired Chick.[63]

### G.    The Altered 2023 EBITDA Calculation

Meanwhile, on May 8, Melson had told Cathcart that Star Infra intended to remove and replace him as CEO.[64]  Cathcart responded that Star Infra would "need to get a court order" to do so.[65]

On June 1, Cathcart directed Feiler to create a new "[EBITDA] report [for] Star [Infra]."[66]  Feiler understood that Cathcart was "looking for $18 million or more" in 2023 Actual EBITDA.[67]  When Feiler "counsel[ed] [Cathcart] that there's a cap" on addbacks under the credit agreement that made this impossible, Cathcart asked Feiler to "take out the cap."[68]

On June 3, Feiler told Cathcart that even when he "maximized Y[ear] E[nd] add backs," there was "only 20k additional [they] could have charged . . . [which]

---

[62] *Id.* at 169-70; JX 74 at 8-10.

[63] JX 72 at 3; Melson Tr. 169, 171-72, 256-57; JX 73.

[64] Cathcart Tr. 39-41; *see also* JX 178.

[65] Melson Tr. 167.

[66] JX 56 at 2.

[67] Feiler Tr. 234.

[68] *Id.* at 242-44.

d[id]n't help with the 18m argument."[69]  Cathcart directed Feiler to "[k]eep[] working through it, [to] get to $18m."[70]  He insisted that he "need[ed] that $18m."[71]

On June 4, Feiler sent Star Infra a new calculation showing 2023 Actual EBITDA of approximately $18.3 million.[72]  This was 36 days after the EBITDA reporting deadline set by Section 8.3(a) of the LLC Agreement.[73]  Cathcart told Feiler not to "provide detail behind [their] statement" and to "[d]rag it out" to "[m]ake [Star Infra] pay for an audit."[74]

## H.    Cathcart Doubles Down.

On July 9, Cathcart learned that Star Infra had hired Chick.[75]  The next day, Cathcart told Star Infra that the Company's lender had "reviewed and blessed" the $18.3 million EBITDA figure.[76]  He represented that the lender had "agreed with the add-backs and agreed that it conformed to the credit agreement."[77]  These statements were false.[78]

---

[69] JX 86 at 3.

[70] *Id.* at 1.

[71] JX 56 at 3.

[72] PTO ¶ 30; JX 88 at 3; *see also* JX 194.

[73] *See supra* note 50 and accompanying text.

[74] JX 56 at 3.

[75] Cathcart Tr. 41.

[76] JX 105.

[77] *Id.*

[78] Cathcart Tr. 104-07; Feiler Tr. 250, 252-54; JX 93.

Cathcart also threatened to have Chick "escorted out" if he tried to enter Company property.[79] When Chick arrived at Company headquarters on July 15— his first day on the job—he was escorted into a conference room by Thom Cathcart.[80] Cathcart "joined by phone [and] threatened to call the police to have [Chick] removed for trespassing . . . ."[81]

## I.     A Brief Ceasefire

Amid the hostilities, a "reputable firm" expressed interest in acquiring Star Infra's Company equity.[82] Cathcart recommended a "60-day ceasefire" to present a "united front" and close the deal.[83] In exchange, he agreed that Chick could join the Company as Star Infra's designated "Operating Partner," allowing Chick to collaborate with him and participate in discussions with potential buyers, lenders, or clients.[84]

But the sale process collapsed and, with it, the ceasefire.[85] Attempts to find compromise were unsuccessful.[86] On August 22, Star Infra reiterated that it was

---

[79] JX 105.

[80] Melson Tr. 184-85.

[81] *Id.*

[82] *Id.* at 184.

[83] JX 103.

[84] JX 195.

[85] Melson Tr. 186-87.

[86] *See* JX 98 at 2-4; JX 97 at 2.

exercising its right under Section 8.3(a) of the LLC Agreement to immediately replace Cathcart with Chick as CEO.[87] Cathcart would remain Executive Chairman.[88]

Cathcart responded negatively. He warned of legal action, including to remove Star Infra personnel from the Company's offices.[89]

On August 23, Star Infra filed this action under 6 *Del. C.* § 18-110.[90] It seeks a declaration that Cathcart was removed as CEO and replaced by Chick pursuant to the LLC Agreement.[91] On September 9, I entered a status quo order designating Cathcart as CEO for the limited duration of this suit, with Chick remaining the Operating Partner.[92]

After expedited discovery, a one-day trial was held on October 18.[93] Post-trial briefing was completed on October 25.[94]

---

[87] JX 123.

[88] *Id.* at 1-2.

[89] JX 124.

[90] Dkt. 1.

[91] *Id.*

[92] Dkt. 38; *see also* Dkt. 52 (holding that maintaining the Company's longstanding CEO was less disruptive for the Company during this limited period).

[93] Dkt. 90.

[94] *See* Def. Casey Cathcart's Post-trial Br. (Dkt. 94) ("Def.'s Post-trial Br."); Pl.'s Post-trial Br. (Dkt. 95).

## II.     ANALYSIS

Star Infra seeks a declaration that it validly terminated Cathcart as CEO and appointed Chick to replace him. Its claim is brought under Sections 18-110 and 18-111 of the Delaware Limited Liability Company Act, which "vest jurisdiction with the Court of Chancery in actions involving removal of managers and interpreting, applying or enforcing LLC agreements."[95] Star Infra has the burden to prove its claim by a preponderance of the evidence.[96]

Section 18-110 empowers this court to "hear and determine the validity of any . . . appointment [or] removal . . . of a manager of a limited liability company."[97] A manager includes "a person . . . [w]hether or not a member of a limited liability company, who, although not a 'manager' as defined in § 18-101 of th[e] [statute], participates materially in the management of the limited liability company."[98] Cathcart managed the day-to-day business of the Company and—before the challenged events—was its de facto manager.[99]

---

[95] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999).

[96] *See, e.g.*, *Taylor v. State*, 748 A.2d 914 n.11 (Del. 2000) (TABLE) ("[T]o establish something by a preponderance of the evidence means to prove that something is more likely so than not so.").

[97] 6 *Del. C.* § 18-110(a).

[98] *Id.* § 18-110(c).

[99] Dkt. 23 at 1-2, 17.

Section 18-111 empowers this court to "interpret, apply or enforce the provisions of a limited liability company agreement" as well as determine the "duties, obligations or liabilities among members or managers."[100] Here, Star Infra's claim involves the interpretation of the Company's LLC Agreement. Star Infra asserts that its removal of Cathcart as CEO and appointment of Chick as CEO was a proper exercise of its rights under Section 8.3(a).

Cathcart reads the LLC Agreement differently. He contends that Cathcart, Inc.'s approval is required before the Company's CEO can be removed or a new CEO appointed. He also raises an affirmative defense under the implied covenant of good faith and fair dealing concerning Chick's selection.[101]

As discussed below, I find in favor of Star Infra. The parties have now stipulated that the Company's 2023 Actual EBITDA was below $18 million.[102] This result triggered Star Infra's unambiguous right to remove Cathcart and replace him in its sole discretion. None of Cathcart's arguments provides grounds to hold otherwise.

---

[100] 6 *Del. C.* § 18-111.

[101] Def.'s Post-trial Br. 26-33. A party raising affirmative defenses has "the burden to prove each element of each of [its] affirmative defenses by a preponderance of the evidence." *TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *21 (Del. Ch. Sept. 11, 2017).

[102] PTO ¶ 26; *see also id.* ¶ 31.

16

## A. Star Infra's Unambiguous Removal and Replacement Right

In Section 18-110 suits, "the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to 'interpret [the] contract [and] effectuate the parties' intent.'"[103] "Delaware [courts] adhere[] to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party."[104] The court will "give priority to the parties' intentions as reflected in the four corners of the agreement" by construing the agreement as a whole and giving effect to all included provisions.[105] "When [a] contract is clear and unambiguous," the court must "give effect to the plain-meaning of the contract's terms and provisions without resort to extrinsic evidence."[106]

---

[103] *A & J Cap., Inc. v. L. Off. of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (citing *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012)); *see also Mickman v. Am. Int'l Processing, LLC*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009) ("LLC agreements are creatures of contract, which should be construed like other contracts." (citing *Arbor Place, L.P. v. Encore Opportunity Fund, LLC*, 2002 WL 205681, at *4 (Del. Ch. Jan. 29, 2002))).

[104] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[105] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I*, 36 A.3d 776, 779 (Del. 2012).

[106] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (citation omitted).

### 1. Section 8.3(a) of the LLC Agreement

Section 8.3(a) of the LLC Agreement sets out a two-tier structure for the removal and replacement of the CEO based on EBITDA thresholds. For the higher threshold, the Company's board leads the replacement process:

> On or after December 31, 2023, in the event that the Actual EBITDA for the Company was less than $21,000,000 for the calendar year ending December 31, 2023, but more than $18,000,000 *the Board* will commence with a search for a replacement Chief Executive Officer, subject to the consent of Star Infra and Cathcart Inc. (not to be unreasonably withheld conditioned or delayed) acting in the best interests of the Company. *The Board* shall take all Necessary Action to promptly recruit, vet and hire a replacement Chief Executive Officer.[107]

But if a lower EBITDA threshold is hit, Star Infra has the right to terminate and replace the CEO:

> On or after December 31, 2023, in the event that the Actual EBITDA for the Company was less than $18,000,000 for the calendar year ending December 31, 2023, *Star Infra* may commence with a search for a replacement Chief Executive Officer, hire a replacement Chief Executive Officer on such terms and conditions as *determined in its sole and absolute discretion* and terminate Casey Cathcart as the Company's Chief Executive Officer.[108]

---

[107] LLC Agreement § 8.3(a) (emphasis added).

[108] *Id.* (emphasis added).

Before trial, Cathcart stipulated that the Company's reported 2023 Actual EBITDA fell below $18 million.[109] He conceded that—despite previously insisting otherwise—the $18.3 million EBITDA figure Feiler circulated in June 2024 included impermissible addbacks.[110] Thus, the lower EBITDA threshold was implicated—giving Star Infra unilateral removal and replacement rights.

Since EBITDA fell below $18 million, Star Infra had the right to "search" for a new CEO, "terminate" Cathcart as CEO, and "hire" a replacement CEO.[111] It could do so on "terms and conditions" determined in its "sole and absolute discretion."[112] Nothing in the LLC Agreement limits its exercise of this unambiguous right.

### 2. Cathcart's Arguments

Cathcart advances a different reading of the LLC Agreement. He asserts that the LLC Agreement requires the affirmative vote of at least one Cathcart, Inc.-affiliated board member to remove the Company's CEO.[113] This argument implicates two provisions of the LLC Agreement that grant

---

[109] PTO ¶ 26; Cathcart Tr. 101 (conceding that the $18.3 million EBITDA figure was "[t]rue legally").

[110] PTO ¶ 31; Cathcart Tr. 102; *see also infra* Section III.A (addressing Star Infra's request for fee shifting based on Cathcart's false statements).

[111] LLC Agreement § 8.3(a).

[112] *Id.*

[113] *See* Def.'s Post-trial Br. 18-21.

member-affiliated directors consent rights on certain decisions made by the Company.[114]

Section 8.2(f) of the LLC Agreement requires the consent of at least one "Star [Infra] Director" and one "Cathcart[, Inc.] Director" for certain Company "Major Decisions."[115]  It states, in relevant part:

> Notwithstanding anything to the contrary contained in th[e] [LLC] Agreement . . . *the Company and its Subsidiaries* shall not . . . take, directly or indirectly *on behalf of the Company or any of its Subsidiaries*, and no director, officer, employee, agent or other representative of the Company or any of its Subsidiaries shall have any authority to cause or to permit *the Company or any of its Subsidiaries* to take, any action, make any decision, expend any sum or undertake or suffer any obligation which comes within the scope of any of the following actions [without consent from one Star Infra and one Cathcart, Inc. director].[116]

Section 8.2(g) extends similar but more limited consent rights to 730 CTHRAIL LLC ("730 Member"), which became a member of the Company in July 2022.[117]  It states that, "[n]otwithstanding anything to the contrary contained in th[e] [LLC] Agreement . . . *the Company and its Subsidiaries* shall not . . . take [certain]

---

[114] *Id.* at 20-21.

[115] LLC Agreement § 8.2(f).

[116] *Id.* (emphasis added).

[117] *Id.* § 8.2(g); *see* PTO ¶ 25.  Cathcart's post-trial brief largely focuses on Section 8.2(g) rather than Section 8.2(f).  *See* Def.'s Post-trial Br. 18-21.  At times in prior briefing and in his testimony, however, he has raised both provisions.  Given the overlap, I address Section 8.2(f) alongside Section 8.2(g) for the sake of completeness.

action[s] . . . without the consent of the 730 [Member] Director" and at least one director designated by each of Star Infra and Cathcart, Inc.[118]

One of the Company decisions that requires member-designated director consent under Sections 8.2(f) and 8.2(g) is the "appoint[ment], remov[al], or replace[ment] [of] the chief executive officer."[119]

Cathcart points out that "notwithstanding" clauses, like those in Sections 8.2(f) and 8.2(g), "clearly signal[] the drafter's intention that . . . [those] section[s] override conflicting provisions of any other section."[120]  That is, he believes that the consent rights afforded members in Sections 8.2(f) and 8.2(g) override Star Infra's rights in Section 8.3(a).

But there is no conflict between Sections 8.2(f) and 8.2(g), on the one hand, and Section 8.3(a), on the other hand.[121]  Sections 8.2(f) and 8.2(g) place conditions on certain decisions made by the Company.  They do not address actions and decisions assigned to a member.[122]  Section 8.3(a), by contrast, expressly grants Star

---

[118] JX 46 § 8.2(g) (emphasis added).

[119] *Id.* §§ 8.2(f)(iii)(A), 8.2(g)(ii).

[120] Def.'s Post-trial Br. 19 (quoting *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)).

[121] *See, e.g.*, *In re Est. of Crist*, 863 A.2d 255, 258 (Del. Ch. 2004) (holding that "[d]espite the inclusion of the word 'notwithstanding,'" one section in a contract did not trump another section because the two were "not in conflict"), *aff'd*, 879 A.2d 602 (Del. 2005) (TABLE).

[122] JX 46 §§ 8.2(f), 8.2(g).

Infra—not the Company or its board—the exclusive right to "search for" and "hire" a replacement CEO if 2023 Actual EBITDA falls below $18 million.[123] Unlike Sections 8.2(f) and 8.2(g), Section 8.3(a) does not grant any other member a consent right or cabin how Star Infra can exercise its rights.

Delaware courts must interpret contracts "in a way that does not render any provisions illusory or meaningless."[124] By Cathcart's reasoning, Cathcart, Inc. would have a veto right over a decision that the LLC Agreement leaves exclusively to Star Infra. This reading would eviscerate Star Infra's rights to "terminate" the CEO and "appoint" a new one in its "sole discretion."[125]

Cathcart's interpretation would also render superfluous the limits on member consent rights in Section 8.3(a) where Actual EBITDA is less than $21 million but more than $18 million.[126] In this scenario, Section 8.3(a) gives certain members— through their board designees—consent rights that cannot be "unreasonably withheld" and must be exercised in the "best interest of the Company."[127] The major

---

[123] *Id.* § 8.3(a).

[124] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (citation omitted).

[125] LLC Agreement § 8.3(a).

[126] *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

[127] LLC Agreement § 8.3(a).

decision provisions in Sections 8.2(f) and 8.2(g), however, lack such limitations on how member-appointed directors may exercise their discretion when approving certain Company decisions.[128]

The provision of Section 8.3(a) triggered when EBITDA falls below $18 million would also become meaningless if it required board or other member consent. There would be no reason to differentiate between the removal mechanism when EBITDA falls below $18 million, which does not expressly contemplate consent rights, and when EBITDA falls between $21 and $18 million, which does. This distinction also "speaks volumes" on the parties' intent.[129] The parties knew how to make board or member consent a condition to certain acts. But they excluded such conditions from Star Infra's removal and appointment rights if the lower EBITDA threshold was met.

Further, even if Sections 8.2(f) and 8.2(g) conflicted with Section 8.3(a), Cathcart's arguments would fail. Delaware courts follow the canon of construction that "specific terms and exact terms are given greater weight than general

---

[128] *See id.* §§ 8.2(f), 8.2(g).

[129] *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *3 (Del. Ch. Nov. 4, 2003) (invoking the *inclusio unius est exclusio alterius* canon of construction when observing that the inclusion of "noteholder approval" in one part of a section but not "shareholder approval" suggested "[shareholder] approval [wa]s not a condition to the [a]greement").

language."[130]  If 2023 Actual EBITDA fell below $18 million, Section 8.3(a) created a specific exception to the more general provision on CEO appointment and removal in Section 8.2.

Star Infra's interpretation of the LLC Agreement is the only reasonable one. It gives meaning and effect to each of the contract's terms.  Conversely, Cathcart's interpretation creates multiple inconsistencies.

### B.    Implied Covenant of Good Faith and Fair Dealing

As an affirmative defense, Cathcart asserts that Star Infra "violated the implied covenant of good faith and fair dealing."[131]  Cathcart argues that Star Infra exercised its discretion to seek out and hire a CEO in bad faith by selecting Chick.[132] He maintains that Star Infra's recruitment effort was too rushed and that it chose a person lacking rail experience to "supplant [him]" as "quickly as possible."[133]

Any room left in the LLC Agreement for the implied covenant is narrow.  The LLC Agreement not only empowers Star Infra to use its "sole and absolute discretion" to set "terms and conditions" of the new CEO's employment;[134] it also

---

[130] Restatement (Second) of Contracts § 203(c) (1981); *see DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("[W]here specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[131] JX 152 at 29-30.

[132] Def.'s Post-trial Br. 30-33.

[133] *Id.* at 30.

[134] LLC Agreement § 8.3(a).

permits it to exercise its discretion without consideration of other members' or the Company's interests. The LLC Agreement eliminates all fiduciary duties Star Infra owes to the Company or to any other member and explicitly permits Star Infra to consider its interests alone.[135]

Still, the vesting of discretion in Star Infra did not entirely relieve it of the obligation "to use that discretion consistently with the implied covenant of good faith and fair dealing."[136] "[W]hen a contract provides discretion to one party and the scope of that discretion is not specified 'the implied covenant requires that the discretion be used reasonably and in good faith.'"[137] Good faith under the implied covenant contemplates "faithfulness to the scope, purpose, and terms of the parties' contract."[138]

To the extent that the implied covenant applies, Cathcart failed to prove that Star Infra acted in bad faith by recruiting, vetting, or hiring Chick. Star Infra hired

---

[135] *See id.* § 2.2 ("Wherever in this Agreement a Member is permitted or required to make a decision or determination or take an action in its 'discretion' or its 'judgment,' that means that such Member may take that decision in its 'sole discretion' or 'sole judgment' without regard to the interests of any other Person."); *id.* § 7.4 ("To the fullest extent permitted by applicable Law, no Member shall have any fiduciary duties to the Company or to any other Member.").

[136] *Miller v. HCP Trumptet Invs., LLC*, 194 A.3d 908, 908 (Del. 2018) (TABLE).

[137] *Policeman's Annuity and Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) (citing *Airborne Health, Inc. v. Squid Soap*, LP, 984 A.2d 126, 146 (Del. Ch. 2009)).

[138] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

two respected search firms to find a qualified turnaround CEO.[139] Star Infra put together a screening committee to review proposed candidates.[140] Both Star Infra and the search firms reviewed and interviewed multiple candidates over several weeks.[141] Chick was identified as the best fit and, after several interviews, hired.[142] There is nothing unreasonable or nefarious about this process.

Cathcart's "ideal CEO" candidate would have extensive experience in the railroad industry.[143] But the parties never agreed that such expertise—or any specific qualification—was a prerequisite for future Company executives.[144] Star Infra decided that there were characteristics, like experience turning around struggling companies, that were "more important than rail experience, which many [employees] of the [C]ompany had."[145] Regardless, Chick has been the CEO of four

---

[139] *See* JX 74 at 23; JX 52 at 15; *see also* Melson Tr. 168-69.

[140] *See* Melson Tr. 169-70; JX 74 at 15.

[141] *See* JX 74 at 4-23; Melson Tr. 169.

[142] *See* JX 74 at 9-10; Melson Tr. 170-71.

[143] Def.'s Post-trial Br. 12; *see also* Cathcart Tr. 34-35.

[144] By that strained logic, an individual with prior experience as the CEO of a fast casual Mexican restaurant would be unfit to lead a coffee company. *See* Danielle Kaye & Julie Creswell, *Starbucks Replaces C.E.O With Chipotle's Brian Niccol*, N.Y. Times (Aug. 13, 2024), https://www.nytimes.com/2024/08/13/business/starbucks-ceo-brian-niccol-chipotle.html.

[145] Melson Tr. 171; *see also* JX 74 at 19 ("Proven 'turnaround' experience is more important that specific industry experience.").

companies, at least two of which had a "similar operation" to the Company.[146] Selecting him to lead the Company does not indicate bad faith by Star Infra.[147]

*       *       *

Because the Company's 2023 Actual EBITDA fell below $18 million, Section 8.3(a) of the LLC Agreement gave Star Infra the unambiguous right to replace Cathcart as CEO. Star Infra opted to exercise that right. It launched a search process, hired Chick, and terminated Cathcart. Nothing in the LLC Agreement prevented it from doing so. Nor did the implied covenant of good faith and fair dealing.

Cathcart was aware that the Company's EBITDA results could lead to this outcome. As discovery revealed, he tried to fudge the Company's financial results to avoid it. But he cannot circumvent the bargain he struck. He was validly removed as CEO of the Company and Chick was validly appointed as his replacement.

## III. SANCTIONS

Star Infra seeks sanctions against Cathcart on two grounds. First, it asks that the court award its reasonable attorneys' fees incurred due to Cathcart's bad faith

---

[146] Melson Tr. 171.

[147] Star Infra has invested tens of millions of dollars in the Company. It would be commercially unreasonable to hire a CEO that it felt was bound to fail.

conduct.[148]  Second, it contends that Cathcart is in contempt of the status quo order entered in this case.[149]  The first argument has merit; the second does not.

## A.  Attorneys' Fees

"The Delaware Supreme Court has consistently affirmed the American Rule under which both sides pay their own attorneys' fees."[150]  Although this court has the discretion to shift fees if circumstances warrant, the American Rule "remains the default."[151]  Exceptions to the American Rule that can merit fee shifting include situations where:

> [(1)] the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and [(2)] cases in which, although a defendant did not misuse the "litigation process in any way, . . . the action giving rise to the suit involved bad faith, fraud, 'conduct that was totally unjustified, or the like' . . . ."[152]

Both types of bad faith are found here.

Pre-litigation, Cathcart caused Feiler to manufacture an inflated statement of 2023 Actual EBITDA that Cathcart knew was inconsistent with the LLC

---

[148] Pl.'s Post-trial Br. 50-55.

[149] *Id.* at 55-59.

[150] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2024 WL 4602914, at *5 (Del. Ch. Oct. 29, 2024) (citation omitted).

[151] *Id.*

[152] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 687 (Del. 2013) (citation omitted).

Agreement.[153]   He pressured Feiler to reach a number above $18 million and suggested that Feiler "look[] for" impermissible addbacks.[154]   After Feiler circulated the revised figure, Cathcart falsely informed Star Infra that the Company's creditors had "reviewed and blessed" it.[155]

During litigation, Cathcart continued to obfuscate.   He maintained that the $18.3 million EBITDA figure was operative, though he knew it was untimely and contravened the credit agreement and the LLC Agreement.[156]   The court set an expedited trial schedule based, in part, on Cathcart's claim that the Company's 2023 Actual EBITDA was in dispute.[157]

Discovery into the true EBITDA figure ensued, during which Cathcart continued to deny that 2023 Actual EBITDA was below $18 million.[158]   Then, on the eve of trial, Cathcart withdrew this contention and stipulated otherwise.[159]   In doing so, he conceded that he lacked grounds for two out of his three theories for breach of the implied covenant: (1) that Star Infra delayed credit agreement

---

[153] *See supra* notes 66-74 and accompanying text.

[154] Feiler Tr. 234.

[155] JX 105.

[156] Dkt. 45 (Answer) 3-5; *see also* JX 167 at 2.

[157] Dkt. 52 at 25-26, 31-33.

[158] *Compare* JX 167 at 2, *with* JX 86 at 2 and Feiler Tr. 244; *see also* Dkt. 52 at 25-27 (including the validity of the company's 2023 EBITDA value as a "discovery topic").

[159] PTO ¶ 26.

amendments that affected the 2023 Actual EBITDA calculation, and (2) that Star Infra "knew" 2023 Actual EBITDA could not be calculated until a year-end audit concluded.[160]

Delaware courts have shifted fees where a defendant advanced "multiple theories" that had "minimal grounding in fact and law" and "made the litigation more expensive than it should have been."[161] Cathcart's false statements drove up litigation costs and unnecessarily expanded the scope of this case. Without his tactics, the case arguably could have been resolved on summary judgment based on the terms of the LLC Agreement.

Cathcart's reliance on a falsity until just before trial warrants fee shifting. Star Infra is entitled to the reasonable fees it incurred in refuting Cathcart's baseless defenses.[162]

---

[160] Dkt. 45 (Answer) 29-30; JX 181 at 25, 29.

[161] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227-28 (Del. 2005) (citation omitted); *see also Bay Cap. Fin., L.L.C. v. Barnes & Noble Educ., Inc.*, 2020 WL 1527784, at *11 (Del. Ch. Mar. 30, 2020) (awarding attorneys' fees where a party "doubled down" on misleading statements in court filings, "did not provide a factual basis from which anyone could reach that conclusion," and engaged in discovery abuse), *aff'd*, 249 A.3d 800 (Del. 2021) (TABLE).

[162] *See Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *20-21 (Del. Ch. Oct. 27, 2015) (shifting fees incurred in defending one claim that, although bordering on frivolous, the plaintiff refused to abandon until shortly before trial); *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231, 235-37 (Del. Ch. 1997) (awarding fees based on a finding of defendants' bad faith where, among other issues, "contemporaneous documents created by defendants" proved plaintiff's claims), *aff'd*, 720 A.2d 542 (Del. 1998); *Auriga Cap.*

## B. Contempt

Star Infra next contends that Cathcart violated the status quo order.[163] This court may provide relief "[f]or failure to obey a restraining or injunctive order, or to obey or to perform any order."[164] A finding of civil contempt for violating a status quo order is appropriate where a party is (1) bound by the order, (2) has notice of the order, and (3) nevertheless violates the order.[165]

The first two factors are met: Cathcart was bound by and had notice of the status quo order. The third factor is not.

Star Infra has not proven, by a preponderance of the evidence, that Cathcart meaningfully violated the status quo order.[166] Technical violations of the order are

---

*Corp. v. Gatz Props., LLC.*, 40 A.3d 839, 881-82 (Del. Ch. 2012) (concluding that fee shifting was appropriate where the defendant "and his counsel simply splattered the record with a series of legally and factually implausible assertions"), *aff'd*, 59 A.3d 1206 (Del. 2012); *Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co.*, 444 A.2d 256, 258, 261 (Del. Ch. 1982) (shifting fees where there was "no evidence in the record [supporting defendant's defense]," which the defendant did not abandon until after discovery, shortly before trial).

[163] *See* Dkt. 95 at 55-59.

[164] Ct. Ch. R. 70(b).

[165] *See DiDonato v. Campus Eye Mgmt., LLC*, 2024 WL 368112, at *9 (Del. Ch. Jan. 31, 2024), *appeal dismissed*, 315 A.3d 517 (Del. 2024) (TABLE).

[166] *See TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 644 n.97 (Del. 2022) ("[T]he preponderance standard is the appropriate burden for findings of civil contempt."); *cf. In re Aerojet Rocketdyne Hldgs., Inc.* 2022 WL 2180240, at *22-25 (Del. Ch. June 16, 2022).

insufficient.[167]  To merit sanctions, the violation "must constitute a failure to obey the court in a meaningful way."[168]  None of its complaints rises to that level.

First, Star Infra asserts that Cathcart failed to ensure that the Company responded to Star Infra's information requests within three days.[169]  The three-day deadline has a carveout: "if the requested information is not reasonably available, the parties will confer in good faith about the requested information, and if necessary, provide additional time for such information to be provided."[170]  The evidence reflects that Cathcart worked with Feiler and Chick to discuss and satisfy Star Infra's information requests.[171]  Although some information was not immediately available, Chick later gained access.[172]  Any violation of the status quo order was a technical one.

Second, Star Infra argues that Cathcart violated a prohibition on disparaging Star Infra or Chick.[173]  In a September 12 email to Melson, Thom Cathcart, Chick, and three others, Cathcart called Chick a "cookie-cutter CEO-for-hire" who would

---

[167] *DiDonato*, 2024 WL 368112, at *9.

[168] *Dickerson v. Castle*, 1991 WL 208467, at *4 (Del. Ch. Oct. 15, 1991) (citation omitted).

[169] JX 139 § 2(i).

[170] *Id.*

[171] *See* Feiler Tr. 261; Cathcart Tr. 49-50.

[172] *See* Feiler Tr. 262-64; JX 143 at 1.

[173] JX 139 ¶ 2(q).

"destroy th[e] Company."[174]  A discourteous email to a limited group hardly amounts to disparagement.  A contempt finding is unwarranted.

Finally, Star Infra asserts that Cathcart violated the status quo order by excluding Chick from company meetings.[175]  On September 16, Cathcart told a Company officer that he could "say no" to Chick's request to attend a planning meeting.[176]  But the status quo order does not grant Chick unfettered access to meetings.  It requires Cathcart to provide Chick "full access" to the Company's employees and to "work collaboratively" with Chick.[177]  Company employees were not explicitly required to accede to Chick's requests to attend meetings.[178]

## IV.    CONCLUSION

Star Infra is entitled to judgment in its favor under Sections 18-110 and 18-111 of the LLC Act.  Star Infra validly removed Cathcart as the Company's CEO and appointed Chick to that role.  It had the right to do so under Section 8.3(a) of the

---

[174] JX 153 at 3.

[175] Pl.'s Post-trial Br. 58 (citing JX 139 ¶ 2(j)).

[176] JX 157 at 1, 6.

[177] JX 139 ¶ 2(j).

[178] *Cf. Mother Afr. Union First Colored Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992) ("A cardinal requirement for any adjudication of contempt is that the order allegedly violated give clear notice of the conduct being proscribed.").

LLC Agreement. Cathcart failed to prove his affirmative defense based on the implied covenant of good faith and fair dealing.

Star Infra is also entitled to a reasonable award of fees and expenses insofar as they were incurred because of Cathcart's bad faith conduct, as set forth above. It is not entitled to a finding of civil contempt.

The parties are to confer on an order to implement this decision and file it within one week.